# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2814

_____

| | | |
|---|---|---|
| Alex A. Mason, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Correctional Medical Services, Inc.; | * | Appeal from the United States |
| Gary Campbell, Dr., | * | District Court for the |
| | * | Eastern District of Missouri. |
| Defendants/Appellees, | * | |
| | * | |
| Elizabeth Conley; Unknown Rice; | * | |
| Unknown Rakestraw; Unknown Gavett, | * | |
| Dr., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| James Carter; Missouri Department of | * | |
| Corrections, | * | |
| | * | |
| Defendants/Appellees, | * | |
| | * | |
| Mason Eye Clinic; Dean P. Hainsworth, | * | |
| Dr.; Unknown Hendrix, Dr.; Lenworth | * | |
| N. Johnson, Dr.;Unknown Doctors; | * | |
| Gary Kempker; Jim Moore, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: April 18, 2008
Filed: March 24, 2009

_____

Before MURPHY, COLLOTON, and SHEPHERD, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Alex Mason, a Missouri state prisoner, suffered a blood clot that caused permanent blindness in his left eye. Mason sued the manager of his prison housing unit, James Carter, and the director of prison medical services, Dr. Gary Campbell, alleging that they violated his Eighth Amendment rights by failing to facilitate or render adequate medical treatment. Mason also sued the Missouri Department of Corrections ("MDOC"), alleging that the MDOC denied him meaningful access to prison benefits and services after he became blind, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.

The district court[1] granted summary judgment in favor of Dr. Campbell and MDOC. *Mason v. Corr. Med. Serv., Inc.*, No. 2:04-CV-32, 2007 WL 433380 (E.D. Mo. Feb. 6, 2007). Mason's claim against Carter proceeded to trial, and a jury returned a verdict in favor of Carter. The district court[2] then denied Mason's post-trial motion for judgment as a matter of law. Mason appeals the district court's decisions granting summary judgment for Campbell and MDOC, and refusing to set aside the jury's verdict for Carter. We affirm.

I.

Mason is incarcerated at the Northeast Correctional Center ("NECC") in Missouri. He has been partially blind since childhood, when he lost use of his right eye. Mason awoke in prison on the morning of July 13, 2003, to find his left eye

_____

[1]The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

[2]The Honorable Carol E. Jackson, Chief United States District Judge for the Eastern District of Missouri.

-2-

swollen and watering. By July 15, his vision had become blurred, and he was experiencing throbbing head pain.

On July 15, Mason visited the medical wing of the NECC, and saw Dr. Christine Gavett, an independent contractor employed by Correctional Medical Services, Inc. ("CMS"). Dr. Gavett noted that Mason may have developed a blood clot in the left eye, termed a Central Retinal Arterial Occlusion ("CRAO"). She characterized CRAO as an emergency condition, and referred Mason to an outside ophthalmologist, Dr. Jason Hendrix, for an appointment later that day. Dr. Hendrix, however, did not receive Mason's medical file or Dr. Gavett's suspicion that Mason had suffered a CRAO. Dr. Hendrix diagnosed Mason as having diabetic retinopathy, a nonemergency condition, scheduled Mason for a routine reexamination one week later, and sent Mason back to the prison without treatment.

When Mason woke up the next morning, July 16, he was blind in the left eye, and his pain had worsened. Mason alleges that he and his cellmate, Willie Oliver, went to the office of James Carter, the prison housing unit manager, and requested emergency medical care. Mason alleges that Carter agreed to notify Correctional Medical Services, and then ordered Mason and Oliver to return to their cell. Upon returning to his cell, Mason was bedridden. Other inmates gave him ibuprofen and a damp cloth for his injured left eye. When they did not hear from CMS later that day, Mason alleges that several inmates went to see Carter to request medical care for Mason. One of the inmates who went to see Carter, James Bailey, testified that Carter told him that he was "taking care" of Mason's request. Another inmate, Mason's cellmate, testified that Carter "never responded" when he asked why Mason had not received medical care, and that Carter told him to submit a Medical Services Request. Mason's cellmate testified that he completed a request with Mason's help and put it in the appropriate mailbox. Carter testified that he could not remember anyone visiting him about Mason's medical condition.

For the next six days, Mason did not leave his bed. He claims that pain produced by the CRAO made it impossible for him to eat, sleep, or move about during that period.

On July 22, Mason saw Dr. Gavett for the reexamination that Dr. Hendrix had scheduled seven days earlier. Dr. Gavett observed that Mason's condition had deteriorated, and called the office of CMS's Regional Medical Director for permission to make another emergency referral to the outside clinic. Mason testified that he was in the room and "specifically heard Dr. Gavett refer to Dr. Campbell by name during this call." (App. 145). After the emergency referral was approved, an ophthalmologist at the outside clinic concluded that Mason had suffered an irreversible CRAO in the left eye, and that the only treatment available was to reduce the pain.

Mason sued Carter and Dr. Campbell for alleged violations of the Eighth Amendment, pursuant to 42 U.S.C. § 1983, and MDOC for alleged violations of the ADA. The district court granted summary judgment for Dr. Campbell and MDOC, and the claim against Carter proceeded to trial. At the conclusion of the evidence, the district court concluded as a matter of law that Mason had a "serious medical need" of which Carter had knowledge, but ruled as a matter of law that Carter did not cause Mason's blindness, because the CRAO led to irreversible blindness prior to May 16. Because Mason presented evidence that he suffered pain as a result of delayed treatment, however, the court instructed the jury to decide whether Carter had been deliberately indifferent to Mason's serious medical need, and whether Mason had suffered damages as a result. The jury returned a verdict in favor of Carter. The district court denied Mason's subsequent motion for judgment as a matter of law.

II.

A.

Mason argues that the district court erred by granting summary judgment on the claim that Dr. Campbell violated Mason's rights under the Eighth Amendment. The district court concluded as a matter of law that Mason failed to show that Dr. Campbell knew of Mason's serious medical need. The court relied on the facts that Mason had not informed Dr. Campbell of his blindness in a timely manner to allow him to take action, that Dr. Conley, not Dr. Campbell, approved inmate medical referrals, and that Mason's medical records undermined his claim that Dr. Gavett mentioned Dr. Campbell's name in speaking to CMS personnel before declaring an emergency. Based on these undisputed facts, the district court determined that no reasonable juror could conclude that Dr. Campbell was personally involved. We review a grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in favor of Mason, the non-moving party. *Rehrs v. Iams Co.*, 486 F.3d 353, 355-56 (8th Cir. 2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

To prevail on his claim based on the Eighth Amendment, Mason must show that he had a serious medical need of which Dr. Campbell was aware, and that Campbell's deliberate indifference to that need caused harm to Mason. *See Senty-Haugen v. Goodno*, 462 F.3d 876, 889-90 (8th Cir. 2006). In support of his contention that Campbell knew of Mason's serious medical need, Mason points to his own testimony that he was in the room on July 22 when Dr. Gavett called the CMS's Regional Medical Director for permission to make another emergency referral, and that he "specifically heard Dr. Gavett refer to Dr. Campbell by name during this] call."

-5-

We conclude that Mason did not submit any admissible evidence that Dr. Campbell had knowledge of Mason's serious medical need. We question whether it is reasonable to infer from the snippet of conversation to which Mason refers that Dr. Gavett made a referral to Dr. Campbell. That Dr. Gavett mentioned Dr. Campbell's name during the telephone call does not establish that Dr. Gavett was speaking with Dr. Campbell. But in any event, Mason's testimony is inadmissible hearsay. Dr. Gavett's alleged statement referring to Dr. Campbell was made out of court, and it was offered by Mason to prove that Dr. Campbell was the person on the other end of the phone. Mason has not argued that the statement falls under any exception to the hearsay rule, and we conclude that none is applicable. Mason cannot rely on hearsay to avoid summary judgment. *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923 (8th Cir. 2004). Without any admissible evidence that Dr. Campbell was informed of Mason's serious medical need, there is no basis for an Eighth Amendment claim against him, and the district court correctly granted summary judgment.

B.

Mason next argues that the district court erred by denying his motion for judgment as a matter of law after the jury found in favor of Carter, the manager of the prison housing unit. We review the district court's denial of Mason's motion *de novo*, upholding the verdict unless no reasonable juror could have found in favor of Carter based on the trial record. *Sanders v. May Dep't Stores Co.*, 315 F.3d 940, 943 (8th Cir. 2003).

To prove deliberate indifference, Mason must show that Carter possessed a "state of mind more blameworthy than negligence," amounting to criminal recklessness. *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994). In other words, Mason must show that Carter was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that Carter actually drew that inference. *Id.* at 837. Even if Carter knew of Mason's serious medical need, he

is not liable if he "believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844.

Mason alleges that Carter, as unit manager, controlled access to the prison medical system, but refused to allow Mason to receive care on July 16, 2003, despite promising to notify Correctional Medical Services about Mason's complaint. Although the evidence shows that the CRAO caused irreversible blindness before Carter's involvement in the chain of events, Mason argues that he suffered unnecessary pain as a result of Carter's inaction. According to Mason, Carter knew that Mason had a serious medical need, and that Mason's serious medical need would go untreated, because "once [Carter] told [Mason] he would handle it there is nothing nobody else in that house could do." (Tr. 136). Carter testified to the contrary, stating that Mason could have received emergency medical care at any time without Carter's permission, by "self-declar[ing] . . . [an] 'emergency' to any staff member," (Tr. 226), pressing "an emergency call button" in any prison cell, (Tr. 227), or submitting a Medical Services Request form directly to CMS. Consistent with the notion that Carter was not the exclusive avenue to medical care, Mason testified that he visited CMS on July 15 without Carter's involvement, after having a corrections officer fill out the necessary request form. In the same vein, Mason's cellmate testified that he submitted a Medical Services Request form on Mason's behalf after Carter told him to do so.

We conclude that a reasonable juror could choose to believe Carter's testimony and return a verdict in favor of Carter. Carter's testimony, if believed, would support a finding that Carter actually believed (albeit perhaps unsoundly) that the risk of Carter's inaction was "insubstantial or nonexistent," *Farmer*, 511 U.S. at 844, because Mason had alternative means to obtain emergency medical care. Under the deferential standard of review applicable to a jury's findings, and viewing the evidence in the light most favorable to Carter, we affirm the district court's denial of Mason's motion for judgment as a matter of law.

C.

Mason's final contention is that the district court erred by granting summary judgment in favor of MDOC on Mason's claim under the Americans with Disabilities Act. Mason sought prospective relief in the form of an order requiring MDOC to provide him with certain accommodations in response to his blindness.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "[R]ecreational activities, medical services, and educational and vocational programs" at state prisons are benefits within the meaning of Title II, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (internal quotations omitted), and "qualified individual[s] with a disability" are entitled to "meaningful access" to such benefits. *Randolph v. Rodgers*, 170 F.3d 850, 857-58 (8th Cir. 1999).

A "qualified individual with a disability" is an individual "who, with or without reasonable modifications to rules, policies, or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). As relevant to this case, "auxiliary aids and services" includes "qualified readers, taped texts, audio recordings, Brailled materials, large print materials, or other effective methods of making visually delivered materials available to individuals with visual impairments." 28 C.F.R. § 35.104(2). While a public entity is required to make reasonable accommodations where necessary to give "meaningful access" to programs or benefits, *Randolph*, 170 F.3d at 858, the entity need not make available "auxiliary aids and services" if it can show that to do so would be "unduly burdensome." *Id*. at 858-59; *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998); *see* 28 C.F.R. § 35.150(a)(3).

Mason's argument focuses primarily on two benefits that he claims have been denied. First, Mason argues that he has been denied meaningful access to prison benefits, including library benefits, which require him to read and write. MDOC argues that it provided Mason with meaningful access to these benefits by providing an inmate reader, who is available to read to Mason in person and to create audio tapes of written material at Mason's request, and by granting Mason access to audio materials by mail and to a tape recorder.

Mason says that these accommodations are inadequate, because his current reader, Grayer Dear, is not always available. Mason also asserts that the audio materials he ordered through the mail never arrived. Mason requests, in lieu of MDOC's offering, that the prison provide a qualified reader or interpreter who can read to him as necessary, including when grievance forms need to be signed, and he renews his request for access to audio materials. Alternatively, Mason requests training in Braille, or computer software that reads written materials aloud to the blind.

We conclude that Mason has failed to raise a disputed issue of material fact with respect to whether MDOC's accommodations gave him meaningful access to prison benefits involving reading and writing. Mason acknowledged that he was able to select the fellow inmate who would be his assistant, (App. 540), and that Mr. Dear escorts him everywhere he goes and assists him with anything that he needs. (App. 345). He also explained that Mr. Dear recorded written materials onto audio tapes, and that these recordings were furnished to Mason. (App. 350). Mason does complain that Mr. Dear is not always available, but the only example he cites of such unavailability is a parole hearing during which he was not allowed to have an assistant present. He does not point to anything about the absence of an assistant that prevented him from presenting his case at that hearing, and he claims only generally that the outcome of the hearing might have been different had he been able to "assist" himself. (App. 349). It is undisputed that MDOC offered to allow Mason to order audio materials by mail, and Mason's vague testimony that this "has never taken place" is

insufficient to show that MDOC actually refused to follow through on its offer in response to a proper request from Mason. (App. 350). MDOC, of course, has a continuing obligation under the ADA to make reasonable accommodations for Mason, and the substitution of an assistant who is illiterate or not reasonably available, or the failure to procure requested audio materials, would raise different issues. On this record, however, we agree with the district court's ruling, and because MDOC's present accommodations are sufficient, it is unnecessary to consider alternative accommodations such as Braille materials or computer software.

Mason also argues that he has been denied meaningful access to prison facility benefits by being deprived of a trained assistant capable of assisting him in his day-to-day activities. MDOC responds that it provided Mason with meaningful access to these benefits through provision of an inmate assistant, and by facilitating Mason's ability to make requests of the prison administration by audio recording rather than in writing. Mason contends that the accommodation is inadequate, because his inmate assistant is not qualified to teach a blind person how to prepare food, clean, exercise, and bathe, and that he is entitled to professional instruction and assistance.

The district court determined that MDOC had reasonably accommodated Mason by making available a prisoner assistant to help Mason with these tasks. The court further concluded that it would be unduly burdensome to require MDOC to furnish Mason with a trained handler from outside the prison, because such a person would not be trained in safety and security matters, and would require the escort of a prison guard at all times. As Mason does not explain what a professional assistant could teach him about the foregoing tasks that his inmate assistant cannot, we see no basis on this record to overturn the district court's decision. *Cf. Chisolm v. McManimon*, 275 F.3d 315, 328 (3d Cir. 2001) (holding that a reasonable trier of fact could infer that a deaf inmate whose primary form of communication was American Sign Language required an assistant trained in American Sign Language at critical points).

Mason next argues that he has been deprived of meaningful access to the prison's exercise and recreation facilities. Mason walks with his inmate assistant, but he contends that MDOC must accommodate him with an alternative form of recreation, namely, weightlifting. Mason cites no evidence, however, that his assistant was unable to help with weightlifting. Instead, the record shows that Mason himself elected not to lift weights, because lifting weights is "not conducive" to people with his disability. (App. 348). On this undisputed record, there is no genuine dispute about MDOC's reasonable accommodation of Mason's desire to exercise.

Mason further asserts that he was not provided with meaningful access to his housing unit's ADA compliance officer. In particular, Mason alleges that he received no response to several ADA requests, and that the prison never conducted a "disability needs assessment" that he requested.

The allegation of non-responsiveness is not supported by the record. Mason testified that he knew the identity of the ADA compliance officer in his housing unit, and that the officer had in fact answered requests that Mason submitted. Mason specifically admitted that the ADA compliance officer had not refused Mason's requests for assistance. On the second point, Mason cites no authority for the proposition that he is entitled to a general "disability assessment," and the district court noted that he abandoned this request when briefing the motions for summary judgment. MDOC's current policy is to respond to ADA requests on an "as-needed basis." To show a violation of Title II, Mason must specify a benefit to which he was denied meaningful access based on his disability. 42 U.S.C. § 12132. Mason has failed to identify a particular benefit that MDOC denied him, and the allegation that the requested assessment might uncover unspecified violations of the ADA is not enough to create a disputed issue for trial with respect to this accommodation.

\* \* \*

The judgment of the district court is affirmed.

_____