# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3277

_____

| | | |
|---|---|---|
| Kevin Loye; Gina Gist; Vikki Marshall; David Stiles, | * * * | |
| Plaintiffs - Appellants, | * * | Appeal from the United States District Court for the |
| v. | * * | District of Minnesota. |
| County of Dakota, | * * | |
| Defendant - Appellee. | * | |

_____

Submitted:  June 16, 2010
Filed:  November 17, 2010

_____

Before LOKEN, ARNOLD, and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

On the afternoon of September 6, 2004, boys stole two bottles of mercury from an abandoned building, took this hazardous substance to a playground near the Rosemount Woods mobile home park, and released it while playing.  Before police from the City of Rosemount, Minnesota were notified and arrived at the scene, people, homes, and vehicles were contaminated.  Police officers knocked on doors to identify those who had been exposed, and the City contacted state and local agencies to help deal with the environmental and public health emergency.  The Special Operations Team (SOT), a disaster response unit created by an agreement between Dakota County and eleven cities including Rosemount, arrived at about 9:00 p.m. and set up

a decontamination tent. Shortly after 11:00 p.m., the SOT began decontaminating forty-nine persons who had been exposed to mercury, including Kevin Loye, Gina Gist, Vikki Marshall, and David Stiles, who are deaf. The next day, nurses from the Dakota County Department of Public Health began attending to the victims' health, housing, and financial needs. The victims were provided temporary housing while their quarantined homes were decontaminated. By the end of the month, the health and environmental hazards were successfully abated.

One year later, Loye, Gist, Marshall, and Stiles filed Charges of Discrimination with the Minnesota Department of Human Rights alleging that Dakota County, the City of Rosemount, the State of Minnesota, and the American Red Cross violated the Minnesota Human Rights Act ("MHRA") when they "failed to provide ASL [American Sign Language] interpreters . . . for all of the services they were providing to the public." In December 2006, the Department issued "No Probable Cause" determinations dismissing the charges against Dakota County. Loye, Gist, Marshall, and Stiles (collectively, "Plaintiffs") then filed this action in federal court, alleging that the County's failure to provide ASL interpreters violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794; and the MHRA, Minn. Stat. § 363A.12. Two years later, they sued the City, the State, and the American Red Cross in state court asserting the same MHRA claims and alleging that the Department of Human Rights found probable cause to support the charges against these respondents.

At the close of discovery, the district court[1] granted Dakota County's motion for summary judgment, concluding that Plaintiffs received effective communication, and therefore meaningful access to the programs and services offered during three relevant periods: (1) the emergency decontamination process; (2) public group

---

[1] The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, now retired.

meetings between victims and representatives of various government agencies conducted the following week; and (3) additional private meetings between Dakota County Public Health Nurse Gerilee Greeley and individual plaintiffs. Loye v. County of Dakota, 647 F. Supp. 2d 1081, 1090, 1092, 1094, 1095 (D. Minn. 2009). Plaintiffs appeal. Reviewing the grant of summary judgment *de novo*, we affirm. Randolph v. Rodgers, 170 F.3d 850, 856 (8th Cir. 1999) (standard of review).

## I. The Decontamination Process.

Plaintiffs argue that Dakota County violated the ADA, the RA, and the MHRA by failing to provide interpreters when Plaintiffs were decontaminated by the SOT on the night of September 6. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. As relevant here, the substantive standards of § 504 of the RA and the ADA are the same. See 42 U.S.C. § 12133; Gorman v. Bartch, 152 F.3d 907, 911-12 (8th Cir. 1998).[2] The parties agree that Plaintiffs are qualified individuals with a disability and that Dakota County is a public entity. Although the County was not responsible for the mercury contamination, the governmental effort to decontaminate the victims of that emergency was, without question, a service to which the requirements of § 12132 applied. See Randolph, 170 F.3d at 858. Consistent with the Supreme Court's interpretation of the RA in Alexander v. Choate, 469 U.S. 287, 301 (1985), we construe Title II of the ADA as requiring that qualified persons with disabilities receive "meaningful access" to a public entity's services, not merely "limited participation." Randolph, 170 F.3d at 858. Depending on the circumstances, this may require the use of "auxiliary aids and services," such as interpreters for the

---

[2]In general, the ADA and the MHRA are also construed the same. See Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001). Plaintiffs' brief asserts in a footnote that Minn. Stat. § 363A.12, subd. 1, "imposes more stringent requirements" than the ADA, but they make no separate MHRA argument.

hearing impaired. <u>See</u> <u>Mason v. Corr. Med. Servs., Inc.</u>, 559 F.3d 880, 886 (8th Cir. 2009), applying 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104(2).

Plaintiff Marshall was interviewed by Rosemount police at the playground at 6:30 p.m. on September 6. Her son had played with the mercury, and the miscreant boys had poured mercury in her eight-year-old daughter Cassie's hair. Marshall became contaminated when she comforted Cassie. She told the officers she was deaf and asked for an interpreter. The home of Plaintiffs Loye and Gist became one of the most contaminated when the boys brought the jars of mercury to the residence and spilled some. Loye and his son Cory touched the unknown substance. A police officer came to the residence and wrote "mercury" when Loye said he was deaf. Loye misunderstood the message and told Gist that someone had been molested.

Beginning at 11:00 p.m., each family identified as needing decontamination entered the SOT's tent (sequentially, not all at once). Once inside, they removed their clothes and jewelry and were sprayed and brush scrubbed with soap and water. They were then given suits or blankets to cover themselves and boarded a bus that took them to a hotel shelter the American Red Cross had arranged. As no interpreter was present, the SOT communicated with those who were deaf by gesturing, lip reading, writing, and limited sign language. Marshall's household included her two children, then-fiancé Jeff Beaman, a hearing person, and Stiles, who was visiting. This family was among the first to be decontaminated because Cassie was the most seriously contaminated victim. After decontamination, Marshall accompanied Cassie to a local hospital for testing and treatment. Plaintiffs Loye and Gist and their three-year-old son were the last to be decontaminated. All Plaintiffs were understandably confused and afraid throughout the harrowing decontamination process.

In granting summary judgment on this claim, the district court focused on the SOT's services "during the emergency midnight decontamination." The court concluded that the ADA did not require "delay in protecting the public or in

ameliorating such a danger," that it was not reasonable to require the emergency responders to come equipped with a full-time interpreter, and that Plaintiffs' ability to follow directions and complete the successful decontamination demonstrated that, despite the absence of interpreters, "[t]he communications were effective." Loye, 647 F. Supp. 2d at 1088-89.

On appeal, Plaintiffs argue that they first asked the police for interpreters hours before the decontamination began, so the district court erred because no delay in handling the emergency would have occurred had interpreters been timely provided.[3] To consider this contention requires a more detailed look at the chronology of events on the night of September 6. Rosemount Police responded to the report of a suspicious substance at 6:30 p.m. Police Sergeant Erickson and Assistant Fire Chief Haeg were the City's incident commanders at the scene. They requested SOT assistance at 9:00 p.m. SOT members arrived with their equipment at about 9:20 p.m. It is undisputed that (i) the SOT performed decontamination tasks assigned by the incident commanders, (ii) no SOT member had contact with contamination victims, including Plaintiffs, until they were brought to the SOT tent to be decontaminated, and (iii) Dakota County had no responsibilities (or even presence) on September 6 other than the SOT.[4]

Given Dakota County's lack of overall responsibility or involvement other than that of the SOT, Plaintiffs are forced to contend that Dakota County is liable for the failure of City of Rosemount police officers and incident commanders to have interpreters available when the SOT decontaminated the victims later that night. Plaintiffs cite no authority supporting this theory of joint governmental liability.

---

[3]We reject as meritless Plaintiffs' additional contention that the district court decided an issue not fairly presented by the County's motion for summary judgment.

[4]The County argues that it is not liable under the ADA for the actions of the multi-agency SOT. Like the district court, we need not reach that issue.

Perhaps it would be at issue if Plaintiffs had not split their claims and sued the other responding public entities in state court. But given the decision to split their claims, their liability-without-fault theory in this case raises, as the district court noted, the spectre of double damage recoveries. Therefore, on this record, while we have little doubt that Plaintiffs had need of interpreters when the emergency decontamination services began, they failed to prove that the County was responsible for interpreters not being present. The SOT's services began when Plaintiffs were brought to the decontamination tent. Viewing the situation at that point in time, we agree with the district court that the means of communication SOT members then employed provided Plaintiffs with timely, meaningful access to the emergency decontamination services. See Mason, 559 F.3d at 887-88. Loye testified that he asked a fireman for an interpreter when he was brought to the decontamination tent. The fireman was presumably part of the SOT, but at that point, "waiting for an oral interpreter . . . [wa]s not a reasonable modification of [SOT] procedures given the exigent circumstances" of an emergency hazardous materials decontamination. Bircoll v. Miami-Dade County, 480 F.3d 1072, 1086 (11th Cir. 2007).[5]

## II. The Large-Group Meetings.

After the decontamination, Plaintiffs were provided temporary housing until their homes had been decontaminated by the Minnesota Pollution Control Agency. The Dakota County Department of Public Health assumed responsibility for arranging a series of large public meetings at which officials from the various responding agencies discussed the health effects of exposure to mercury, the need to decontaminate homes and cars and to investigate whether children and pets had been exposed, the temporary housing arrangements, and when their homes could be

---

[5]Loye and Marshall requested an interpreter after boarding the bus that would take them to the hotel shelter. But the decontamination had ended, and Dakota County was not responsible for providing the bus or the temporary shelter.

reoccupied. When the Department learned on September 7 that some victims were hearing impaired, efforts were made to have interpreters present at these meetings.

In support of its motion for summary judgment, the County presented evidence that an interpreter was present at all of the six to eight large-group meetings held from September 7 through September 15. In response, Plaintiffs presented Vikki Marshall's testimony that the County failed to notify her of the first meeting on September 7, that no interpreter was present at two meetings, and that communication at two other meetings was imperfect because the interpreter spent time at individual discussions with Loye and Gist instead of interpreting the large-group discussion. The testimony of Loye and Gist was consistent with the County's claim that an interpreter was provided at every large-group meeting.

Rejecting Plaintiffs' contention that "an interpreter is mandated for every meeting," the district court concluded that, considering the series of meetings as a whole, "plaintiffs received effective communication." Loye, 647 F. Supp. 2d at 1090. The court noted that, on September 8, County officials obtained an interpreter for the large-group meeting and then held an additional ASL-interpreted private meeting at which deaf evacuees could ask questions. "Plaintiffs identify no information they missed nor any harm suffered as a result of any alleged failure to provide interpreters." Id. at 1091.

On appeal, Plaintiffs argue the district court erred when it disregarded the requirement in the Attorney General's regulations that the County "ensure that communications with [Plaintiffs] are *as effective as* communications with others." 28 C.F.R. § 35.160 (emphasis added). We disagree that Title II of the ADA demands compliance with Plaintiffs' literal reading of this regulation. The Supreme Court construed a similarly worded regulation under § 504 of the RA as meaning that "benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons,

but must afford handicapped persons equal opportunity to . . . gain the same benefit." Therefore, the Court concluded, "Tennessee is not required to assure that its handicapped [program] users will be as healthy as its nonhandicapped users." Alexander, 469 U.S. at 305-06. "Any interpretation of § 504," the unanimous Court explained, "must . . . be responsive to two powerful but countervailing considerations -- the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." Id. at 299.

In our view, the same principles apply in construing Title II of the ADA and its implementing regulations. We agree with the district court that Dakota County effectively communicated with Plaintiffs at the large-group meetings for the reasons the court explained. After the events of September 6, the primary services were to decontaminate the victims' property, attend to their health care and related needs, provide temporary shelter, and assist them in moving back into their homes. Providing timely information about the risks of mercury and the decontamination process was an important aspect of effective emergency response services. But there is a difference between providing information -- a service -- and the series of meetings at which information is provided. Plaintiffs confuse the two when they argue that Title II required that an ASL interpreter must be present at every meeting. Therefore, the fact disputes Plaintiffs emphasize were not material to the grant of summary judgment because the record establishes they had meaningful access to the services provided all evacuees. Compare Robertson v. Las Animas County Sheriff's Dep't, 500 F.3d 1185, 1199 (10th Cir. 2007) (summary judgment denied because deaf detainee could not hear what was happening at his probable cause hearing); Aikins v. St. Helena Hosp., 843 F. Supp. 1329, 1336 (N.D. Cal. 1994) (summary judgment denied because physician's misunderstanding undercut defendant's allegation that communication with patient's deaf spouse was effective). Here, even if at times delayed, the information communicated during the large-group meetings was not so time-sensitive that the delay denied Plaintiffs effective communication and meaningful access to the services being provided.

### III. The Individual Family Meetings.

Along with arranging the large-group meetings, the Department of Public Health assigned experienced Public Health Nurse Greeley to provide housing, health-related, and other services on an individual basis to hearing impaired evacuees, including Plaintiffs. Nurse Greeley met about ten times with Loye and Gist. Greeley obtained a prescription drug and scheduled a doctor's appointment for Loye, helped Loye and Gist move to temporary housing, advised when group meetings would be held, provided a booklet and list of resources for obtaining financial aid and transportation services, scheduled an appointment to select a new carpet for their decontaminated home, and advised when they could return home. Greeley provided an ASL interpreter for at least two of the first three meetings. After that, Greeley's detailed contemporaneous notes reflect that less complex issues were discussed without an interpreter, using lipreading or writing, and the record confirms that she frequently communicated with Loye via email. The home of Loye and Gist was one of the last to be decontaminated; they returned on September 23.

Nurse Greeley met less often with Vikki Marshall, and when they did meet, Marshall's then-fiancé Beaman, who could hear, was often present. Greeley met with Marshall and Beaman on September 8 and discussed Cassie's medical status. The next morning, Greeley picked up Cassie's urine sample and delivered it to the hospital. Later that day, Marshall and Beaman returned to their home, one of the first to be decontaminated. After that, Greeley met with or called Marshall or Beaman about five times, obtaining shampoo and prescription medicine, making sure Cassie's health tests were completed, advising what community services were available, and providing forms to obtain emergency funds for spill victims. Marshall testified there was no interpreter present during these contacts. Nurse Greeley testified that she communicated with Marshall via written notes or through Beaman.

The district court concluded that no reasonable jury could conclude that Nurse Greeley failed to communicate effectively with Loye, Gist, and Marshall at these individual meetings. With the exception of Cassie Marshall's blood and urine tests, which were normal, the communications focused on housing, social services, and financial assistance, with Nurse Greeley serving as a helpful intermediary for services provided by other government agencies. At various times, Nurse Greeley communicated with Plaintiffs through interpreters, lipreading, written messages, email, and Beaman. She also provided written instructions, written resource lists, and a TTY contact number. The topics discussed were not complex, and Plaintiffs' responses and actions taken reflected that Nurse Greeley's assistance was understood. 647 F. Supp. 2d at 1094-95.

On appeal, Plaintiffs argue that summary judgment was improper as to this aspect of their claims because the record demonstrates that they "could not fully communicate their questions and concerns" in the individual meetings with Nurse Greeley. But, as we have explained, the legal standard is effective communication that results in meaningful access to government services. There is no evidence that Plaintiffs failed to obtain any service because Nurse Greeley's advice or assistance was not understood, and no evidence Nurse Greeley ignored a specific request for more effective communication or refused a specific request for an ASL interpreter. See Mason, 559 F.3d at 887; Rosen v. Montgomery County, Md., 121 F.3d 154, 158 (4th Cir. 1997).

The personal items Greeley delivered, the emails between Loye and Greeley, and Plaintiffs' successful return to their decontaminated homes are strong evidence of effective communication, and Plaintiffs presented no evidence to the contrary. See Bircoll, 480 F.3d at 1086 (deaf person's response to police instructions demonstrate effective communication). Indeed, because Nurse Greeley provided individualized assistance only to hearing-impaired evacuees, there is no evidence that her communication with Plaintiffs was less effective than the Department of Public

Health's communications with the large number of non-impaired evacuees. Plaintiffs complain they were unable to ask Nurse Greeley questions about the long-term effects of being exposed to mercury. But that was not Greeley's area of expertise, and there is no evidence Plaintiffs were unable to obtain that information from Nurse Greeley or from other sources.

The judgment of the district court is affirmed.

_____