# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-1374

_____

Roger Durand; Linda Durand; Priscilla Durand

*Plaintiffs - Appellants*

v.

Fairview Health Services

*Defendant - Appellee*

------------------------------

Minnesota Hospital Association

*Amicus on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 15, 2018
Filed: September 4, 2018

_____

Before SHEPHERD, MELLOY, and GRASZ, Circuit Judges.

_____

MELLOY, Circuit Judge.

Linda and Roger Durand, both of whom are hearing-impaired, and their hearing-abled daughter, Priscilla Durand (collectively, "Appellants"), allege Fairview Ridges Hospital ("Fairview") failed to provide "meaningful access" to "auxiliary aids and services," in the form of American Sign Language (ASL) interpreters and a teletypewriter (TTY), during the course of their adult son Shaun Durand's terminal hospital stay, in violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*; Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794; and the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.01, *et seq.* Additionally, Priscilla alleges an injury independent of her parents' claim and asserts associational standing under the same statutes. The district court[1] granted Fairview's motion for summary judgment as to both issues. We affirm.

## I. Background

Linda and Roger are a married couple with six adult children. Although Linda and Roger are hearing-impaired, none of their children are deaf. The Durand children communicate with Linda and Roger through a combination of methods, including ASL, lip reading, finger spelling, speaking, and writing. Linda and Roger assert they "do not pick up on all the information their children communicate to them." Linda and Roger also assert they "do not always indicate when they don't understanding something."

Shaun is Linda and Roger's oldest child. When Shaun was seven years old he was diagnosed with Marfan syndrome, a genetic disorder affecting his heart. Over the course of the next several years, Shaun underwent multiple heart surgeries. Appellants assert "Shaun had long believed that he would not live past the age of 30, and had declined to pursue a heart transplant or a left ventricular assist device." In

---

[1]The Honorable Richard H. Kyle, United States Judge for the District of Minnesota.

-2-

May 2013, when he was thirty-one years old, Shaun passed away at Fairview Ridges Hospital.

Priscilla, Shaun's sister and Linda and Roger's daughter, played an active role in Shaun's health care and management. In October 2012, Shaun executed an Authorization to Discuss Protected Health Information, designating Priscilla and three other siblings as individuals with whom his medical information could be shared. Neither Roger nor Linda were included in the authorization.

In November 2012, Priscilla and Shaun met with a Fairview social worker to discuss a transition to hospice care. Shortly thereafter, Priscilla, Shaun, and Fairview's hospice director convened a meeting with the Durand family, including Linda and Roger. Fairview provided an interpreter for the meeting.

In December 2012, Shaun and a Fairview doctor executed a Provider Orders for Life Sustaining Treatment (POLST) wherein Shaun requested doctors not attempt to intubate or resuscitate.

In February 2013, Shaun executed a health care directive designating Priscilla as his sole health care agent. The directive also referred to his POLST and requested Fairview not attempt resuscitation.

In April 2013, Shaun was admitted to Fairview with renal failure. Amy Klopp, an Advanced Practice Nurse, held a palliative "care conference." Fairview asserts care conferences allow "everybody who holds a stake in a person's life to weigh in and feel comfortable and understand the decisions that have been made." Linda and Roger attended the conference. Fairview provided an interpreter for the meeting.

On May 7, 2013, Shaun was admitted to the Fairview intensive care unit for renal failure. He was accompanied by Priscilla and one of his brothers. At the time Shaun was admitted he was "confused" and had a "decreased level of consciousness."

On the morning of May 8, 2013, Priscilla met with Nurse Klopp to discuss key medical decisions, including the decision to move Shaun to end-of-life comfort care and remove his respirator. Nurse Klopp and Priscilla also planned an afternoon care conference with the Durand family, including Linda and Roger. Around noon, Shaun's siblings notified Linda and Roger of Shaun's hospitalization.

Although Fairview requested an interpreter for the afternoon care conference, the interpreter did not arrive until after the conference started. Nurse Klopp then updated Linda and Roger through the interpreter, and Linda and Roger had an opportunity to ask Nurse Klopp questions through the interpreter. Around 5:00 p.m., Shaun's physician held a meeting, with an interpreter present, for an unspecified period of time. According to Fairview's records, an interpreter was dispatched by a third-party vendor to Fairview at 2:52 p.m., arrived at the hospital at 3:44 p.m., and departed the hospital at 6:00 p.m.

During the evening of May 8 and on the morning of May 9, 2013, nurses and doctors were in and out of Shaun's room as a part of their hospital rounds. Interpreters were not present during these visits. At times, Priscilla or a sibling interpreted or shared updates regarding Shaun's condition with Linda and Roger.

On May 9, 2013, Nurse Klopp convened a second care conference. Nurse Klopp updated the conference attendees, including Linda and Roger through the aid of an interpreter.

According to Linda and Roger, at that point they understood the end of Shaun's life was near but believed the timeline to be a matter of days. Linda and Roger

returned home, and Roger proceeded to work his typical overnight shift that night. Linda and Roger devised a plan where Linda would use Fairview's TTY device to contact the voicemail box of Roger's employer in the event there was a change in Shaun's condition. No one had previously attempted to reach Roger at work. Roger asked his supervisor to frequently check the voicemail box.

Later in the evening, after learning Shaun would likely pass away in a matter of hours, Linda requested a TTY machine from the hospital. An administrator initially denied her request. Approximately one hour later, the administrator provided Linda with a TTY machine. Linda declined the administrator's offer of assistance in setting up the device. Linda was ultimately unable to use the TTY machine. Priscilla and one of her siblings attempted to call Roger's work number, but they did not leave voicemail messages. The police eventually notified Roger, while Roger was at work, that his son had passed away.

Linda, Roger, and Priscilla filed suit against Fairview, requesting a series of declaratory judgments, injunctive relief requiring Fairview to provide "appropriate auxiliary aids and services" to hearing-impaired individuals, as well as compensatory, treble, and punitive damages and attorneys' fees. After extensive discovery, Fairview filed a motion for summary judgment, and Appellants filed a motion for partial summary judgment. The district court granted Fairview's motion. Appellants filed a timely appeal.

## II. Standard of Review

We review de novo the district court's grant of Fairview's motion for summary judgment, "viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party." Barstad v. Murray Cty., 420 F.3d 880, 883 (8th Cir. 2005). "Summary judgment is appropriate only if no genuine dispute exists as to any

material fact and the movant is entitled to a judgment as a matter of law." Argenyi v. Creighton Univ., 703 F.3d 441, 446 (8th Cir. 2013) (citation omitted).

## III. Discussion

"Title III of the ADA proscribes discrimination in places of public accommodation against persons with disabilities." Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000); see 42 U.S.C. § 12182(a). Discrimination is defined by the ADA as "a failure to take such steps as may be necessary to ensure that no individual with a disability is . . . treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii). Similarly, Section 504 of the RA provides, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794; see also Alexander v. Choate, 469 U.S. 287, 295 (1985) (noting the type of discrimination Congress sought to remedy with the RA was the type resulting from "thoughtlessness and indifference—of benign neglect" rather than "invidious animus"). Minnesota law also provides people with a disability similar protections against discrimination, through the MHSA. See Minn. Stat. § 363A.11.

Although there are differences between the ADA and the RA, including the RA's aforementioned federal funding requirement, the case law interpreting the two statutes is generally used interchangeably. Loye v. Cty. of Dakota, 625 F.3d 494, 496 (8th Cir. 2010); see also Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998) (noting the substantive similarities between the ADA and RA such that the "cases interpreting either are applicable and interchangeable" (citation omitted)). Additionally, "[i]n general, the ADA and MHRA are also construed the same." Loye, 625 F.3d at 496 n.2 (citing Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001)).

Importantly, for present purposes, neither party articulates a difference between the MHRA and the ADA and RA.

## 1. "Meaningful Access"

In order to establish a discrimination claim, Linda and Roger must demonstrate: (1) they were qualifying individuals with disabilities; (2) Fairview was a "place of public accommodation (for ADA purposes) and received federal funding (for Rehabilitation Act purposes)"; and (3) Fairview "failed to make reasonable modifications that would accommodate [their] disability." Mershon v. St. Louis Univ., 442 F.3d 1069, 1076–77 (8th Cir. 2006). The parties agree (1) Linda and Roger are individuals with a qualified disability, and (2) Fairview is a place of public accommodation receiving federal funding. The remaining question, therefore, is whether there are facts in dispute as to whether Fairview provided Linda and Roger with the necessary aids and services, such as access to an interpreter and a TTY device, during Shaun's hospitalization.

Linda and Roger argue Fairview discriminated against them by failing to provide statutorily required aids and services in the form of sufficient access to interpreters and a TTY device. As a result, Linda and Roger claim they "did not understand crucial aspects of Shaun's prognosis or the decisions that had been made regarding his care." We disagree with Linda and Roger's interpretation of what is statutorily required under the ADA, RA, and MHRA. Although the hospital could have improved upon the services provided, the services Fairview *did* provide allowed Linda and Roger to gain access to the same information and related services as similarly situated, hearing-abled individuals.

Generally, the ADA and RA require "responsible parties to provide 'necessary' auxiliary aids and services." Argenyi, 703 F.3d at 448. Still, while "[b]oth the ADA and [RA] are intentionally broad in scope, . . . they do not require institutions to

provide *all* requested auxiliary aids and services." Id. (emphasis added). A reasonable denial of a request for an auxiliary aid or service does not necessarily create a statutory liability. See id. As such, in order to determine whether the responsible party or parties meet the "necessary" requirement, we apply the "meaningful access" standard. See id. at 449; see also Alexander, 469 U.S. at 301 (citing Section 504 of the RA and noting "an otherwise qualified . . . individual must be provided with meaningful access to the benefit that the grantee offers").

The meaningful access standard requires entities to provide hearing-impaired individuals with "an equal opportunity to gain the same benefit" as their hearing-abled peers. Argenyi, 703 F.3d at 449; see also id. at 448 (noting the ADA aimed "to remedy 'the discriminatory effects of . . . communication barriers' for individuals with hearing disabilities" (quoting 42 U.S.C. § 12101(a)(5))); Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 343 (11th Cir. 2012) (holding the "proper inquiry" regarding "necessary" auxiliary aids and services was whether the aids "gave that patient an equal opportunity to benefit from the hospital's treatment"); Loye, 625 F.3d at 500 (noting the "the legal standard is effective communication that results in meaningful access"). Accordingly, the meaningful access standard necessitates a fact-intensive inquiry and is largely context-dependent. Argenyi, 703 F.3d at 449; Liese, 701 F.3d at 342–43. As such, courts must identify the hearing-abled peer group, as well as the context of the hospital visit, in order to determine whether the hearing-impaired individuals were provided an equal opportunity to access the same benefits.

As Shaun's parents, Linda and Roger are naturally considered to be a part of the group of stakeholders interested in his condition. However, as the district court noted, Linda and Roger did not seek the hospital's aids and auxiliary services as patients or as a patient's designated decisionmaker. In fact, in the years leading up to his final hospitalization, Shaun specifically elected not to include Linda or Roger as parties authorized to receive his medical information. Nor did he designate Linda

or Roger as his health care agents. Thus, when Linda and Roger visited the hospital in May 2013, they did so as family visitors: related, interested, non-patient parties with limited authority to receive certain medical information and no formal decisionmaking agency.

Second, it is undisputed that, over the course of Shaun's final hospitalization, his condition developed into an urgent, emergency situation. While the November 2012 hospice conference and April 2013 palliative care conference helped prepare Linda, Roger, Priscilla, and Shaun's medical team for the ultimate outcome, the timing and course of events were largely unknown. As such, during Shaun's final hospitalization, Priscilla and Shaun's medical team had to make immediate, time-sensitive decisions. In these types of situations, we expect Fairview to prioritize conversations with critical parties who have decisionmaking authority over conversations with family visitors, regardless of their disability status.

Finally, family visitors and similarly situated stakeholders are entitled to effective communication. This includes participation in certain conversations, access to certain information, and, ultimately, effective communication of that information. See 28 C.F.R. § 36.303(c) (requiring hospitals to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities"). Here, Linda and Roger argue they were not able to fully comprehend the severity of Shaun's condition. The evidence, however, shows Fairview provided Linda and Roger with access to information, through interpreters, before and during Shaun's final hospitalization and provided ample opportunities for Linda and Roger to ask questions that may have clarified their understanding of Shaun's condition. On these facts, we cannot conclude Fairview failed to discharge its duty to provide effective communication. See Loye, 625 F.3d at 500.

Next, turning to the TTY device, it is not disputed that Fairview provided a TTY device. There is also no dispute Linda refused the hospital administrator's

assistance in setting up the TTY device. These facts alone are sufficient to establish Fairview provided Linda and Roger with the requested auxiliary aid and offered assistance, which was declined, in setting up the device. Here, the district court also discussed a series of complications with Linda's plan to use the TTY device that were outside the scope of Fairview's control. For example, this was the first time Linda, or anyone else, had attempted to reach Roger at his place of work. And, even though Priscilla and another sibling called Roger at work, they did not leave a voicemail message. As the district court noted, "on these facts, the Court discerns no violation of the law." We agree.

Overall, based on the record, the district court determined there was no factual dispute as to whether Fairview provided a legally sufficient amount of aids and services during the course of Shaun's hospitalization. We agree. As such, Fairview is entitled to summary judgment as a matter of law.

## 2. Associational Standing

The second issue on appeal is whether Priscilla has associational standing to bring a claim against Fairview independent of her parents' claims. Priscilla alleges she was unable to "fully concentrate on her own needs" because she was required to interpret for her deaf parents during the course of Shaun's hospitalization.

Generally, courts have "widely accepted . . . under both the RA and the ADA [that] non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person." McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1142 (11th Cir. 2014) (citing Addiction Specialists, Inc. v. Twp. of Hampton, 411 F.3d 399, 405–09 (3d Cir. 2005) (discussing standing of a non-disabled party under the ADA and RA)). Specifically, the ADA states,"It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities

to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E). Although the RA does not have a similar provision, courts have read part of the statute—"[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act"—as establishing associational standing. 29 U.S.C. § 794a(a)(2); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 280 (2d Cir. 2009).

However, there is a circuit split as to the scope of associational standing under the ADA and RA. Compare Loeffler, 582 F.3d at 277–79 with McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1142 (11th Cir. 2014). In Loeffler, the Second Circuit determined under the ADA and RA, "non-disabled parties bringing associational discrimination claims need only prove an independent injury causally related to the denial of federally required services to the disabled persons with whom the non-disabled plaintiffs are associated." 582 F.3d at 279. The majority in Loeffler concluded that, because a hospital did not provide federally-required services to a deaf patient, and because his two minor and hearing-abled children were required to act as on-call interpreters for their father, forcing the kids to miss school and be "involuntar[il]y expos[ed] to their father's suffering," the children had associational standing. Id. But see id. at 287 (Jacobs, C.J., dissenting) (noting that because Congress intended the standard under the ADA and RA to require non-disabled individuals to be excluded or denied services *because of their association,* and the non-disabled children had not been excluded from or denied services based on their association with their deaf father, the children did not have associational standing under either statute).

In McCullum, the Eleventh Circuit held "a non-disabled individual has standing to bring suit under the ADA [and RA] only if she was personally discriminated against or denied some benefit because of her association with a disabled person." 768 F.3d at 1142. The Eleventh Circuit cited Chief Judge Jacobs'

-11-

dissent in <u>Loeffler</u> and shared his concern at the possibility that "non-disabled individuals may seek relief under the RA and ADA for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer." <u>Id.</u> at 1143–44. The court noted, "If that contention were correct, it would mean that Congress granted non-disabled persons more rights under the ADA and RA than it granted to disabled persons, who can recover only if they are personally excluded, denied benefits, or discriminated against based on their disability." <u>Id.</u> Although the ADA and RA may not intend to grant *more* rights to non-disabled individuals, the statutes do grant *different* rights to disabled and non-disabled individuals.

Here, given the undisputed facts, Priscilla does not qualify for associational standing under either <u>Loeffler</u> or <u>McCullum</u>. As discussed above, Linda and Roger were not denied statutorily required services under the ADA, RA, or MHRA. Priscilla's injury, therefore, cannot be "causally related to the denial of federally required services to the disabled persons with whom the non-disabled plaintiffs are associated," as required in <u>Loeffler</u>. 582 F.3d at 279. Additionally, Priscilla does not claim "she was personally discriminated against or denied some benefit because of her association with a disabled person," as required by <u>McCullum</u>. 768 F.3d at 1142. We conclude Priscilla does not have associational standing. We leave for another day the broader, more general question of when an injured, non-disabled individual may establish associational standing. As such, Fairview is entitled to summary judgment as a matter of law.

## III. Conclusion

For the reasons stated above, we affirm the judgment of the district court.

_____