# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 11-3103/3139

_____

| | | |
|---|---|---|
| State of Minnesota, ex rel. | * | |
| Northern Pacific Center, Inc., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Northern Pacific Center, Inc., | * | |
| | * | |
| Appellant/Cross-Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| BNSF Railway Company, | * | |
| | * | |
| Appellee/Cross-Appellant. | * | |

_____

Submitted: June 12, 2012
Filed: July 24, 2012

_____

Before MURPHY, MELLOY, and COLLOTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

The Northern Pacific Center incurred costs to reduce pollution on a property it owns in Brainerd, Minnesota which had formerly been owned by BNSF Railway and used as a railcar construction and maintenance facility. The Center sued BNSF under the Minnesota Environmental Response and Liability Act (MERLA), Minn. Stat. § 115B.01 et seq., to recover its costs. BNSF moved for summary judgment on

the basis of MERLA's statute of limitations, which the district court[1] denied.  Both parties later moved for summary judgment on the merits, which the district court[2] granted to BNSF, concluding that the type of costs the Center had incurred were not recoverable under MERLA.  The Center appeals the adverse grant of summary judgment and BNSF cross appeals the district court's denial of summary judgment on statute of limitations grounds.  We affirm the grant of summary judgment to BNSF and dismiss BNSF's cross appeal as moot.

## I.

The Minnesota legislature enacted MERLA, also known as the state superfund law, in 1983.  Its intended purpose was "(1) to impose strict liability on those responsible for harm caused by the release of hazardous substances; (2) to allow the state to clean up contamination and collect costs later; and (3) to fund state cleanup activity."  Musicland Grp., Inc. v. Ceridian Corp., 508 N.W.2d 524, 529 (Minn. Ct. App. 1993).  Responsible parties subject to strict liability include those who "owned or operated [a] facility . . . when the hazardous substance, or pollutant or contaminant, was placed or came to be located in or on the facility."  Minn. Stat. § 115B.03, subdiv. 1(1).

When hazardous substances are found on a property, the Minnesota Pollution Control Agency (the agency) can require clean up by the responsible party regardless of current ownership.  Id. § 115B.17, subdiv. 1.  The state and private parties can also undertake cleanup and recover certain costs from the responsible party.  See Minn.

---

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.  Judge Magnuson assumed responsibility for the case in July 2010.

Stat. § 115B.04, subdiv. 1. The statute differentiates between costs that are recoverable by the state and those recoverable by private parties. See id.

From the 1880s until 1983 BNSF owned a parcel of land in Brainerd, Minnesota on which it operated a railcar construction and maintenance facility. BNSF polluted the property in various ways, including by causing the soil to become contaminated with lead. After BNSF sold the property, the agency investigated it, designated it a superfund site, and determined that BNSF was the responsible party. The property changed hands several times before the Center purchased it in 1992, while knowing that it was a superfund site.

After the agency determined that BNSF was the responsible party, the railway hired an environmental consultant to conduct a risk assessment of the property. BNSF negotiated a cleanup plan with the agency under which it would reduce lead levels in the first five feet of soil to 1400 mg/kg through excavation. This level was set with the assumption that the property would be used for commercial and industrial purposes. In 1995 the agency held a meeting in Brainerd to seek public input on the plan; it received no objections. In 2000 the agency sent a letter to the Center indicating that once "BNSF has completed a remediation designed to achieve" cleanup to the 1400 mg/kg level, "there would be no need for further soil remediation at this site."

In 2001 the cleanup plan was formalized in a decision document issued by the agency which indicated that cleanup to the 1400 mg/kg level was the "selected remedial action" for the site. While there is little authority explaining the role of a decision document, the record indicates that it is entered into after a notice and comment process, designates the agency's selected remedial action for a property, and is binding on the responsible party. Shortly after the issuance of the decision document, BNSF and the Center negotiated an access agreement under which BNSF was allowed to enter the property to excavate over 7000 tons of soil. In early 2002

the agency sent BNSF a letter indicating that the railway's actions had achieved the site's cleanup goals.

Later in 2002 the Center decided to undertake a number of projects on the property to redevelop it for commercial and industrial use. The first of these projects involved adding a street and utilities. The Center submitted an environmental contingency plan to the agency detailing how it would reduce any lead contaminated soil discovered during the project to the 1400 mg/kg level. The plan was submitted under the agency's voluntary investigation and cleanup program (voluntary program), which provides liability protection to private parties by allowing them to investigate and clean up hazardous materials without themselves becoming responsible parties. See Minn. Stat. § 115B.175. As part of this project the Center incurred expenses for removing lead contaminated soil and other pollutants from the site.

In 2003 the Minnesota Department of Health evaluated the property after a concerned citizen reported that it might be redeveloped for residential uses. The department issued a report indicating that while the property was in compliance with the decision document's lead cleanup goals, those goals were "significantly above soil lead levels that are typically considered health protective by EPA, [the agency], and [the department]." It concluded that the property's lead concentration was "unlikely to result in significant health risks" to workers on the property and that it currently represented "no apparent public health hazard." The report nevertheless recommended that any future redevelopment for commercial and industrial uses reduce lead levels to 700 mg/kg and that a restrictive covenant be placed on the property limiting it to such uses.

Between 2003 and 2005 the Center engaged in two additional redevelopment projects. For both of these projects it submitted a contingency plan under the voluntary program indicating that it would reduce any lead contamination discovered as part of the projects to the 700 mg/kg level. During that same time period an

outside company expressed interest in purchasing the property and the Center asked the agency about how the property could be delisted from superfund status. The agency replied that delisting would require filing a real property affidavit describing the cleanup to date and a restrictive covenant prohibiting soil movement without the agency's approval in areas with lead levels in excess of 700 mg/kg. The agency alternatively indicated that no restrictive covenant would be needed if lead levels were reduced to 700 mg/kg. In 2006 the Center undertook further lead reduction on portions of the property in an attempt to have them delisted. The agency then delisted areas where lead levels had been reduced to 700 mg/kg.

In 2006 the Center sought authorization from the agency to commence proceedings under MERLA to recover costs related to reducing pollution in each of its redevelopment projects. See Minn. Stat. § 115B.17, subdiv. 12. In a 2008 letter the agency authorized the "response actions" that had been taken by the Center, noting that they were "not inconsistent with" its regulations governing cleanup of superfund sites. See Minn. R. 7044.0100 et seq. The Center then sued BNSF in Minnesota state court to recover costs under MERLA and for common law torts. BNSF removed to federal district court based on diversity jurisdiction and moved for summary judgment on statute of limitations grounds. The district court granted the motion on the common law claims but denied it on the MERLA claim. After further discovery both parties moved for summary judgment, which the district court granted to BNSF. It determined that the types of costs the Center sought to recover were not recoverable under MERLA.

A few months following the district court's decision the agency issued an amendment to the 2001 decision document. The amended document set a lead clean up goal of 700 mg/kg with the assumption that the property would continue to be used for commercial and industrial purposes. It also outlined the redevelopment projects the Center had taken between 2002 and 2006 and said that they had "remediated" lead levels to the 700 mg/kg standard.

The Center appeals the adverse grant of summary judgment on its MERLA claim and BNSF cross appeals the denial of summary judgment on statute of limitations grounds. We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences that can be drawn from the record. Chivers v. Wal-Mart Stores, Inc., 641 F.3d 927, 932 (8th Cir. 2011). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a grant of summary judgment we "may affirm on any basis supported by the record." Hemmingsen v. Messerli & Kramer, P.A., 674 F.3d 814, 816 (8th Cir. 2012).

II.

The Center argues that the district court erred by determining that its costs are not recoverable. To recover costs under MERLA, a nongovernmental plaintiff must show that (1) the defendant was a responsible person, (2) for the release or threatened release of a hazardous substance into the property, (3) which caused or significantly contributed to, (4) the plaintiff's reasonable and necessary removal costs. See Minn. Stat. § 115B.04, subdiv. 1(2); Musicland Grp., Inc. v. Ceridian Corp., 508 N.W.2d 524, 531 (Minn. Ct. App. 1993). When a governmental entity is the plaintiff, the fourth element covers "reasonable and necessary response costs," with response costs defined to include both removal and remedial costs. See Minn. Stat. § 115B.04, subdiv. 1(1); id. § 115B.02, subdiv. 18.

The parties agree that the Center meets the first three elements of a MERLA cost recovery claim since BNSF was a responsible person for the release of the hazardous substances cleaned up by the Center. Because private party plaintiffs can recover removal costs under MERLA but not remedial costs, this case turns on whether the Center's costs were removal or remedial in nature.

-6-

MERLA defines **"removal"** as

> (1) the cleanup or removal of a released hazardous substance, or a pollutant or contaminant, from the environment; (2) necessary actions taken in the event of a threatened release of a hazardous substance, or a pollutant or contaminant, into the environment; (3) actions necessary to monitor, test, analyze, and evaluate a release or threatened release of a hazardous substance, or a pollutant or contaminant; (4) disposal or processing of removed material; or (5) other actions necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, which may otherwise result from a release or threatened release.

Minn. Stat. § 115B.02, subdiv. 17. The statute further provides that removal "includes, but is not limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing . . . and . . . emergency assistance . . . ." Id.

The statute defines **"remedial"** as

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance, or a pollutant or contaminant, into the environment, to prevent, minimize or eliminate the release in order to protect the public health or welfare or the environment.

Id., subdiv. 16. Examples of "remedial" actions include "permanent relocation of residents" and actions at the location of release, including "storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, [or] neutralization." Id.

The district court determined that removal and remedial must have distinct meanings since the legislature chose to grant the state the ability to recover both

-7-

removal and remedial costs while limiting private parties to recovery of only removal costs. It concluded that removal costs are those "intended to mitigate immediate harm" whereas remedial costs are "long-term cleanup costs." Since the cleanup costs at issue were not expended to respond to an immediate threat of harm, the district court concluded that they were not removal costs and thus that the Center had no right to recover them under MERLA.

The Center contends that the district court's definitions of removal and remedial costs lack support in the statute's text or state case law. It urges that the district court's interpretation is contrary to MERLA's goal of facilitating environmental cleanup because it eviscerates private party cost recovery. It also argues that the decision conflicts with MERLA's voluntary program because parties who participate in that program are entitled to cost recovery.

We begin our analysis with the text of the statute. When engaging in statutory interpretation we must "read and construe the statute as a whole, giving effect wherever possible to all of its provisions, and interpret[ing] each section in light of the surrounding sections to avoid conflicting interpretations." Eclipse Architectural Grp., Inc. v. Lam, 814 N.W.2d 692, 701 (Minn. 2012) (citation omitted). We agree with the district court that the terms removal and remedial must have distinct meanings since the legislature gave the state the ability to recover both types of costs while limiting private parties to recovering removal costs. MERLA's definition section states that **remedial actions** are "consistent with [a] permanent remedy" and taken "instead of or in addition to removal actions." Minn. Stat. § 115B.02, subdiv. 16. The lack of the term "permanent" in the definition of removal and the use of the phrase "in addition to removal actions" in the definition of remedial suggests that **removal actions** are of a more preliminary or temporary nature than remedial actions, thus supporting the view that removal costs are those intended to mitigate immediate harm.

The statute's examples are also instructive, as they provide that removal includes security fences to limit access, temporary evacuation and housing, and emergency assistance. Id., subdiv. 17. These items are more in the nature of responding to immediate threats than the examples provided for remedial actions, such as "recycling or reuse," "on-site treatment or incineration," or "permanent relocation of residents and businesses." Id., subdiv. 16. The statute's examples thus also support a definition limiting removal costs to those expended to respond to an immediate threat of harm.

Turning to MERLA case law, no Minnesota court has squarely addressed the differences between the terms removal and remedial. The Minnesota Court of Appeals has stated in dicta, however, that removal refers to "temporary actions" whereas remedial refers to "permanent" actions, thus lending support to the view that removal actions are short term actions taken to respond to an immediate threat. See State ex rel. Hatch v. Emprs. Ins. of Wausau, 644 N.W.2d 820, 826 n.2 (Minn. Ct. App. 2002). The sole Minnesota case cited by the parties in which a private party plaintiff was awarded costs under MERLA involved a situation where the plaintiff was responding to the threat of immediate harm. See Musicland, 508 N.W.2d at 533. There, Musicland began pumping groundwater from its land unaware that a neighboring property was contaminated. Id. at 528. Two days later Musicland learned of the contamination, stopped pumping, and met with environmental consultants to find a way to prevent contamination from entering its property. Id. The Minnesota Court of Appeals determined that the costs of the consultants were recoverable removal costs. Id. at 533.

A comparison to case law interpreting the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq., also indicates that removal costs are those expended in response to an immediate threat. MERLA was modeled after CERCLA, and Minnesota courts have stated that interpretations of the federal law are "instructional"

-9-

in construing MERLA. Emprs. Ins. of Wausau, 644 N.W.2d at 830. CERCLA contains definitions of removal and remedial that are nearly identical to those used in MERLA. Compare 42 U.S.C. § 9601(23)–(24) with Minn. Stat. § 115B.02, subdivs. 16–17. It is well established under CERCLA that removal actions are "those taken to counter imminent and substantial threats to public health and welfare" whereas "remedial actions are longer term, more permanent responses." Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 608 (8th Cir. 2011) (citations omitted).

Contrary to the Center's contention, limiting removal costs to those spent in response to immediate harm does not eviscerate all private party cost recovery because private parties can still recover costs in emergency situations or those where quick action is needed to stop the spread of contamination. This definition of removal also does not conflict with the goals of the voluntary program. The section of MERLA which governs that program says nothing about cost recovery. See Minn. Stat. § 115B.175. Rather, it addresses the issue of liability protection, providing that private parties who undertake clean up actions will not themselves become responsible parties for the cleaned up hazardous materials. See id., subdiv. 1. Moreover, the relevant statutory section is entitled "[v]oluntary response actions." Id. (emphasis added). By referring to response actions rather than removal actions, the statute contemplates that not all costs incurred during participation in the program will be recoverable by private parties. Accordingly, we conclude that the district court correctly determined that removal costs are those "intended to mitigate immediate harm" while remedial costs are "long-term cleanup costs."

We now turn to whether the costs at issue here were removal or remedial in nature. Unlike in Musicland where costs were incurred to prevent the imminent contamination of Musicland's property with hazardous substances, see 508 N.W.2d at 533, the record here indicates that the Center's costs were incurred to redevelop the property and delist it from superfund status. The 2003 Department of Health report concluded that the levels of lead contamination on the property were "unlikely to

-10-

result in significant health risks" and presented "no apparent public health hazard." Deposition testimony by an agency official stated that the property poses no public health hazard for commercial and industrial use. Testimony by the Center's geologic expert indicated that the projects undertaken by the Center were done to redevelop the property rather than to mitigate a threat to public health or the environment. Furthermore, the Center's delisting efforts were undertaken after potential purchasers of the property had expressed interest in having it delisted. This evidence indicates that the Center's costs were not removal costs. Rather, through taking steps to redevelop the property and delist it from superfund status the Center was seeking to achieve a permanent remedy, making its costs remedial costs, which are not recoverable to private parties. See Minn. Stat. § 115B.04, subdiv. 1(2).

The view that the Center's costs are actually remedial costs is also supported by the fact that the responsible agency (the Minnesota Pollution Control Agency) has repeatedly referred to the types of actions undertaken by the Center as remedial. The 2001 agency decision document refers to the reduction of lead levels at the site as "the selected remedial action," a contemporaneous letter sent to the Center from the agency refers to such activities as "remediation," and the 2011 amended decision document refers to the Center's redevelopment actions between 2002 and 2006 as having "remediated" lead levels.

The Center responds that its costs cannot be remedial and thus must be removal because the definition of remedial states that such actions do not "include offsite transport of hazardous substances, pollutants or contaminants," like the soil excavation it undertook here. Minn. Stat. § 115B.02, subdiv. 16(c). The statute goes on to provide, however, that offsite transport of hazardous substances can be remedial actions if the agency approves them because they meet certain criteria, such as being "more cost-effective than other remedial actions." Id. Here, the agency itself approved BNSF's excavation as the selected "remedial" action and provided approval

for the excavation done by the Center in each of its redevelopment projects. This suggests that the lead cleanup taken by the Center can be considered remedial.

We conclude that the costs the Center seeks to recover were not removal costs and thus are not recoverable. Because we affirm the district court's grant of summary judgment to BNSF on the merits, we dismiss as moot BNSF's cross appeal of the district court's denial of summary judgment on statute of limitations grounds. See, e.g., Hillstrom v. Kenefick, 484 F.3d 519, 530 (8th Cir. 2007); Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 237, 246 (3d Cir. 2007).

## III.

The district court's grant of summary judgment to BNSF is affirmed and BNSF's cross appeal is dismissed as moot.

_____