# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3336/3461

_____

Michael S. Argenyi

*Plaintiff - Appellant/Cross-Appellee*

v.

Creighton University

*Defendant - Appellee/Cross-Appellant*

------------------------------

United States; Alexander Graham Bell Association for the Deaf and Hard of
Hearing; National Disability Rights Network; Association of Medical
Professionals with Hearing Losses

*Amici on Behalf of Appellant/Cross-Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 14, 2012
Filed: January 15, 2013

_____

Before MURPHY, BENTON, and SHEPHERD, Circuit Judges.

_____

-1-

MURPHY, Circuit Judge.

Michael Argenyi, a young man with a serious hearing impairment, moved from Seattle to Omaha, Nebraska to attend medical school at Creighton University. Before enrolling Argenyi requested specific accommodations from Creighton for his hearing impairment. They were denied, but Argenyi repeatedly renewed them during his first two years at Creighton Medical School. He explained that without these accommodations he was unable to follow lectures, participate in labs, or communicate with patients.

Because Creighton failed to provide what he considered necessary and reasonable accommodations, Argenyi brought this action under Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12182, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. The district court decided that Argenyi had not shown his requested accommodations were necessary and granted summary judgment to Creighton while denying its motion for costs. Argenyi and Creighton both appeal.[1] We reverse and remand.

## I.

Argenyi began using hearing aids before he was one year old, but his parents primarily communicated with him through spoken language. To distinguish between sounds that appear the same on a speaker's lips Argenyi relied on "cued speech," which uses hand signals to represent sounds. He does not know sign language. In eighth grade Argenyi began using Communication Access Real-time Transcription (CART), a system which transcribes spoken words into text on a computer screen.

---

[1] Several amici support Argenyi's appeal: United States Department of Justice, the Alexander Graham Bell Association for the Deaf and Hard of Hearing and National Disability Rights Network, and the Association of Medical Professionals with Hearing Losses.

Argenyi received a cochlear implant in his right ear in September 2004 before he began undergraduate studies at Seattle University. That university provided CART for Argenyi's lectures and a cued speech interpreter for his lab courses, and Argenyi graduated from Seattle in 2008 with a 3.87 grade point average.

Argenyi stated in his application to Creighton University Medical School in 2009 that he was "hearing-impaired." Upon his admission Argenyi explained to Michael Kavan, Creighton's associate dean for student affairs, that he would require accommodation "similar to what [he] had used in the past . . . primarily interpretation or captioning services during lectures and teaching sessions." Dean Kavan asked for more information about the nature of his hearing disability and a more specific request for the type of accommodation he needed.

Argenyi's otolaryngologist, Dr. Douglas Backous, responded that Argenyi "would benefit from closed captioning" and an FM system which transmits sound directly into cochlear implants. Argenyi also renewed his requests that Creighton supply CART for his lectures, a cued speech interpreter for labs, and an FM system for small learning groups of eight students or fewer. Kavan replied that the written requests submitted by Dr. Backous and Argenyi were inadequate because they differed and the doctor had not made a "direct request."

Before starting medical school Argenyi received a bilateral cochlear implant, and his implant audiologist and Dr. Backous both recommended that to succeed in his studies he would also need CART, a cued speech interpreter, and the FM system. Dr. Backous wrote to Creighton that Argenyi "remains . . . deaf regardless of if he is or is not using his cochlear implants . . . . [He] has a bilateral profound sensorineural hearing loss." Before Argenyi's enrollment, Creighton's medical education management team met to review his requests for accommodation. Dean Kavan then informed Argenyi that Creighton would provide him with an FM system for lectures, small groups, and labs. Argenyi agreed to give the FM system "a wholehearted try."

Shortly before classes began on August 16, 2009, Argenyi renewed his original requests for accommodations. Creighton denied them. After trying the FM system for two weeks, Argenyi informed Dean Kavan that he needed to obtain CART for himself. He wrote the dean that "[t]he [university's] accommodations are inadequate as evidenced by the level of stress and fatigue I am experiencing, as well as the amount of information I am missing . . . . [They] do not provide for meaningful participation nor independence as a student, and also put me at a significant disadvantage academically." Dr. Backous wrote to Creighton in support of Argenyi's needs, urging that

> It is imperative that [Argenyi] have access to visual cues for everyday communication and education. Visual cues include, but are not limited to closed captioning on videos and films, real time captioning for lectures and discussions, and speech reading cues for one-on-one interactions.

The dean responded by offering Argenyi only enhanced note taking services.

In late September 2009 Argenyi brought this action against Creighton, alleging violations of Title III of the ADA and § 504 of the Rehabilitation Act by the university's failure to provide "auxiliary aids and services to ensure effective communication and an equal opportunity to participate in and benefit from the School of Medicine." Argenyi sought a declaratory judgment compelling Creighton to provide him with "auxiliary aids and services to ensure effective communication," as well as compensatory damages and attorney fees.

Argenyi continued to attend class and pursue his medical education. In February 2010 he consulted ear specialist Dr. Britt Thedinger as an expert witness. Dr. Thedinger tested the Creighton FM system and found that with the background noise that Argenyi had only 38 percent speech perception. Dr. Thedinger determined

that "the FM system does not provide any significant benefit and . . . actually reduces [Argenyi's] discrimination ability."

Creighton provided no further auxiliary support or services during Argenyi's first year of medical school, and Argenyi borrowed approximately $53,000 to pay for CART and interpreters himself. In a document publicly available on its website, Creighton estimates that the first year of its medical school costs approximately $71,000 for an average student before financial aid. After paying for his accommodations, the effective cost to Argenyi for his first year of medical school was therefore more than $120,000.

Argenyi renewed his request for accommodation before his second year of medical school. In response Creighton offered to provide an interpreter for lectures and a seat next to the instructor for small group discussions. Argenyi found the interpreter not sufficient to convey complex new vocabulary and again took out approximately $61,000 in loans to pay for CART.

The second year curriculum included clinical courses in which students interviewed and cared for patients. For those courses Creighton refused to allow Argenyi to use an interpreter even if he paid for one himself. Argenyi tried the clinical courses without an interpreter for approximately two weeks and then renewed his request for one. As he explained on September 21, 2010,

> I met with patients . . . and found that I could not understand all of what patients and others at the clinic said. With some patients I understood very little . . . . I know you said I only have to show up to pass, but I want to learn how to be a doctor and I think it is important to understand what the patients are saying to me.

Argenyi and Creighton entered into settlement negotiations in January 2011, and the university temporarily provided him with an interpreter in his clinical courses.

Settlement talks ended the following month, however, and Argenyi was again prohibited from using an interpreter. Argenyi nevertheless succeeded in passing his clinical and other courses, but after his second year he took a leave of absence pending the resolution of his claims under the ADA and the Rehabilitation Act.

In July 2011 Argenyi and Creighton both moved for summary judgment. The district court granted summary judgment to Creighton after it concluded that (1) Argenyi had not shown the accommodations he requested were "necessary" within the meaning of the statutes and (2) that Creighton had provided "effective communication" as required by both laws. The court also rejected Argenyi's affidavit as "unsupported self-serving allegations," denied him relief, and ordered each party to pay its own costs.

Argenyi appeals the district court's grant of summary judgment to Creighton. Creighton cross appeals the denial of costs, asserting that the district court erred by failing to provide a supporting rationale.

II.

This court reviews a district court's grant of summary judgment de novo. Minnesota ex rel. N. Pac. Ctr., Inc. v. BNSF R.R. Co., 686 F.3d 567, 571 (8th Cir. 2012). Facts must be construed favorably to the losing party, and Argenyi is to be given the benefit of all reasonable inferences in the record. Id. Summary judgment is appropriate only if no genuine dispute exists "as to any material fact and the movant is entitled to judgment as a matter of law." Id. (citation omitted). To establish a genuine issue of material fact, Argenyi may not "merely point to self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [his] favor." Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) (citation omitted). A "party's own testimony is often self-serving," but the mere fact that Argenyi's factual testimony is favorable to

his legal claim does not render it incompetent.  C.R. Pittman Const. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford, 453 F. App'x 439, 443 (5th Cir. 2011).

A.

In granting summary judgment to Creighton the district court disregarded Argenyi's affidavit, termed it "self-serving," and concluded that "there [was] an absence of evidence to support [his] claim."  There was, however, a variety of supporting evidence in the record.  Argenyi's affidavit must be considered, and its particular factual allegations scrutinized for "independent documentary evidence" to support them.  O'Bryan v. KTIV Television, 64 F.3d 1188, 1191 (8th Cir. 1995).  In a case such as this it is especially important to consider the complainant's testimony carefully because "the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective."  U.S. Dep't of Justice, The Americans with Disabilities Act Title II Technical Assistance Manual, at II–7.1100 (1993).

Argenyi testified in his affidavit that without CART and interpreters he was "unable to follow class lectures and classroom dialogue" or "the rapid pace of dialogue in the clinical setting."  He stated that he "began experiencing debilitating headaches and extreme fatigue" from his "fruitless attempts" to follow lectures, even though he had "utilized all of [his] time outside of the classroom trying to obtain the information the other students obtained in the classroom."

In clinical courses Argenyi and his patients frequently failed to communicate effectively.  He described in his affidavit a "consult with the parents of a two month old, with communication limited such that [he] did not know . . . why the infant was hospitalized," as well as his struggle to communicate with "emotional family members, patients with accents, and . . . a patient with a history of a broken jaw."  Argenyi stated that Creighton had done "nothing to remedy [his] inability to

-7-

understand what was happening in the clinic" and eventually advised him to "refrain from making requests for additional auxiliary aids and services."

After a careful review of the record, we cannot agree with the district court's conclusion that Argenyi's allegations were "unsupported." The record contains five letters from Argenyi's doctors to Creighton confirming his need for additional auxiliary aids and services. Dr. Backous wrote to Creighton during Argenyi's first month of medical school that "[i]t is imperative that [Argenyi] have access to visual cues for everyday communication and education," including "but . . . not limited to" closed captioning, CART, and a cued speech interpreter. He urged Creighton to consider Argenyi's specific requests, explaining that Argenyi "is the best person to judge what [assistance may be necessary] since no one else can really understand what he is hearing through his cochlear implant systems."

Creighton also received a report from Dr. Thedinger prior to Argenyi's second year, stating that the FM system actually worsened Argenyi's speech discrimination ability to 38 percent comprehension. In addition the record contains correspondence between Argenyi and Creighton in which he repeated requests for an interpreter in clinical courses, which were all denied. During his first two years of medical school, Argenyi borrowed more than $100,000 to pay for the auxiliary aids and services he needed to obtain the medical education he sought, and which Creighton declined to provide.

Argenyi's affidavit, corroborated by evidence from Dr. Backous and Dr. Thedinger and his own need to obtain private loans for CART and interpreters, provides strong evidence that Creighton's accommodations were inadequate and that the university was not entitled to summary judgment. We conclude that the district court erred by disregarding Argenyi's affidavit, the "independent documentary evidence" offered in its support, and all aspects of the record before it. O'Bryan, 64 F.3d at 1191.

B.

The evidence presented by Argenyi must be viewed under the legal standard for ADA and Rehabilitation Act claims. To assert his discrimination claim under either statute, Argenyi must show that (1) he is disabled and academically qualified to attend Creighton, (2) Creighton is a "place of public accommodation (for ADA purposes) and receives federal funding (for Rehabilitation Act purposes)," and (3) Creighton discriminated against him based on his disability. Mershon v. St. Louis Univ., 442 F.3d 1069, 1076–77 (8th Cir. 2006). There is no dispute here as to the first two elements. The key question is whether Creighton discriminated against Argenyi by failing to provide necessary auxiliary aids and services during his first year of medical school and by refusing to permit Argenyi to use an interpreter during his second year clinic.

1.

Congress recognized in enacting the ADA that "individuals with disabilities continually encounter various forms of discrimination, including . . . communication barriers." 42 U.S.C. § 12101(a)(5). The purpose of the ADA was to "provide clear, strong, consistent, enforceable standards" to remedy discrimination in employment (Title I), in the services of public entities (Title II), and in places of public accommodation (Title III). Id. § 12101(b)(2). Under Title III of the ADA, places of public accommodation include "undergraduate[] or postgraduate private schools" like Creighton. 28 C.F.R. § 36.104.

Discrimination is defined by the ADA as a failure to "make reasonable modifications in policies, practices, or procedures" that are "necessary to afford . . . privileges, advantages, or accommodations to individuals with disabilities" or a failure to "take such steps as may be necessary to ensure that no individual with a disability is . . . treated differently than other individuals because of the absence of

-9-

auxiliary aids and services."  Id. § 12182(b)(2)(A)(ii), (iii).  In furtherance of the congressional purpose, Title III of the ADA prohibits places of public accommodation such as Creighton from discriminating against individuals with disabilities "in the full and equal enjoyment" of the "privileges, advantages, or accommodations" they offer.  42 U.S.C. § 12182(a).

Congress specifically intended the ADA to remedy "the discriminatory effects of . . . communication barriers" for individuals with hearing disabilities.  42 U.S.C. § 12101(a)(5).  Regulations promulgated under Title III of the ADA require the provision of "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities," 28 C.F.R. § 36.303(c)(1), and instruct places of public accommodation to "consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication," id. § 36.303(c)(1)(ii).  The regulations specifically provide that appropriate aids and services for deaf individuals include interpreters and CART.  Id. § 36.303(b)(1).

The Rehabilitation Act is similar to the ADA.  Congress enacted the Rehabilitation Act as a "comprehensive federal program," Consol. Rail Corp. v. Darrone, 465 U.S. 624, 626 (1984), to ensure that individuals with disabilities would not "be denied the benefits of[] or be subjected to discrimination under any program or activity" receiving federal funding, 29 U.S.C. § 794(a).  To achieve that purpose the Rehabilitation Act requires entities receiving federal funding to furnish auxiliary aids which "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as others.  45 C.F.R. § 84.4(b)(2).  Creighton receives financial assistance from federal agencies including the Department of Education, so it must comply with § 504 of the Rehabilitation Act.

Both the ADA and the Rehabilitation Act are intentionally broad in scope, but they do not require institutions to provide all requested auxiliary aids and services. Instead, each statute requires the responsible parties to provide "necessary" auxiliary aids and services to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii) (ADA); 34 C.F.R. § 104.44(d)(1) (Rehabilitation Act). Since the ADA and the Rehabilitation Act are "similar in substance," we treat the case law interpreting them as "interchangeable." Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998). Our court has never determined the definition of "necessary" under Title III of the ADA so we must consult the Rehabilitation Act standards as we consider Argenyi's claims under that statute and under Title III of the ADA.

2.

The Supreme Court has held that § 504 of the Rehabilitation Act requires that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." Alexander v. Choate, 469 U.S. 287, 301 (1985). In applying Alexander, our court has concluded that the Rehabilitation Act requires a private medical school to provide "reasonable accommodations . . . when a disabled student would otherwise be denied meaningful access to a university." Stern v. Univ. of Osteopathic Med. & Health Sciences, 220 F.3d 906, 908 (8th Cir. 2000) (citing Alexander, 469 U.S. at 301). In that case, a dyslexic student at a private medical university sued the university under § 504 of the Rehabilitation Act for failing to provide reasonable accommodations in testing. Id. at 907. We affirmed the district court's grant of summary judgment to the university after concluding that the student had "failed to establish a nexus between his requested testing scheme and his dyslexia." Id. at 909.

We also applied a "meaningful access" standard to a Rehabilitation Act claim brought by a hearing impaired prisoner against the Missouri Department of Corrections for having denied him an interpreter during internal disciplinary

proceedings. Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999). The district court in that case had granted the prisoner summary judgment after determining that "[t]he undisputed evidence . . . show[ed] that although he ha[d] been provided with some . . . benefits, he ha[d] not received the full benefits solely because of his disability." Id. We affirmed on appeal, concluding that the record did not "contain credible evidence to support a finding that [the prisoner] enjoyed meaningful access to the prison's internal disciplinary process." Id.

Under a "meaningful access" standard, we have decided that aids and services "are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons," but they nevertheless "must afford handicapped persons equal opportunity to . . . gain the same benefit." Loye v. Cnty. of Dakota, 625 F.3d 494, 499 (8th Cir. 2010) (citing Alexander, 469 U.S. at 305). The Eleventh Circuit has similarly concluded that the "proper inquiry" under the Rehabilitation Act to determine if a hospital had provided "necessary" auxiliary aids to a hearing impaired patient was whether the proffered aids "gave that patient an equal opportunity to benefit from the hospital's treatment." Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 343 (11th Cir. 2012). As the court observed in Liese, that inquiry "is inherently fact-intensive" and "largely depends on context." Id. at 342–43.

The meaningful access standard to ensure an equal opportunity is consistent with the purpose of Title III of the ADA, which is to ensure that all people have "full and equal enjoyment" of public accommodations regardless of disability. 42 U.S.C. § 12182(a). We conclude that § 504 of the Rehabilitation Act and Title III of the ADA each require Creighton to provide reasonable auxiliary aids and services to afford Argenyi "meaningful access" or an equal opportunity to gain the same benefit as his nondisabled peers.

-12-

The Ninth Circuit applied a similar standard to a claim arising under Title III of the ADA. See Baughman v. Walt Disney World Co., 685 F.3d 1131, 1135 (9th Cir. 2012). There, the district court had granted summary judgment to the defendant after concluding that Baughman had failed to show that it was "necessary" for her to use a Segway to visit Disneyland because she would not have been "effectively excluded" without it. 691 F. Supp. 2d 1092, 1095 (C.D. Cal. 2010). The Ninth Circuit reversed, reasoning that the ADA "guarantees the disabled more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" 685 F.3d at 1135 (quoting 42 U.S.C. § 12182(a)). The appellate court instructed the Disney company to "start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." Id.

Considering Argenyi's Rehabilitation Act and ADA claims together, the district court granted summary judgment to Creighton after concluding that Argenyi had failed to show that his requested accommodations were necessary as required under the ADA. The district court looked to guidance from the Supreme Court's decision in PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001), a quite different case from the one brought by Argenyi. In Martin, a professional golfer with a degenerative circulatory disorder sought to travel in a golf cart between the eighteen holes at tournaments. The Court distinguished that golfer from "players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity. In such cases, an accommodation might be reasonable but not necessary." Id. at 682 (emphasis added).

Here, the district court compared Argenyi's situation not with the golfer with the degenerative disorder who obtained relief in Martin but with those "players with less serious afflictions" for whom walking the course was "not beyond their capacity." With this faulty analogy the court reasoned that by use of the auxiliary aids and services Creighton did supply, Argenyi's medical school experience, although "uncomfortable or difficult," was not "beyond [his] capacity." Since Argenyi had not

-13-

been "effectively excluded" from Creighton, his requested additional aids and services were not "necessary" under the ADA. Overlooking Argenyi's evidence which showed that aspects of his medical education at Creighton were beyond his capacity without the accommodations he requested, the court failed to make the appropriate comparison with the golfer with the degenerative disorder in Martin.

The Martin Court indicated that its ruling was narrow and most significantly, it stated that it was not deciding the definition of "necessary" in the context of the ADA, since the PGA Tour had conceded that Martin's requested modification was both "reasonable" and "necessary." 532 U.S. at 683 n.38. The "narrow dispute" before the Court was "whether allowing Martin to use a golf cart, despite the walking requirement that applies to the PGA Tour . . . is a modification that would 'fundamentally alter the nature'" of the golf tournament. Id. at 682. That argument had been undermined by the district court's finding that "the fatigue [for other golfers] from walking during one of [its] tournaments cannot be deemed significant." Id. at 687. Here, there is no allegation that Argenyi is seeking any "competitive advantage" over other medical students. See id. at 670–71.[2]

To the extent that the district court interpreted Martin to mean that the word "necessary" in the ADA requires a showing that the claimant has been effectively excluded from a place of public accommodation, it would be inconsistent with the congressional purpose of the ADA and the Rehabilitation Act. In Title III of the ADA and § 504 of the Rehabilitation Act, Congress required public accommodations

[2]Amicus the United States Department of Justice similarly argues that navigating the golf course in Martin "is far different from a person's ability to understand what is spoken in classroom or clinical instruction in medical school," and that "[n]othing suggests that the Court's comments about a professional athlete's fatigue and discomfort during competition apply to individuals with hearing impairments seeking auxiliary aids and services to ensure effective communication in an academic setting."

and entities which receive public funding to furnish reasonable auxiliary aids and services so that all individuals have an equal opportunity to gain "a like" or "equal" benefit. Baughman, 685 F.3d at 1135; Liese, 710 F.3d at 343. Rather than merely ensure that Argenyi is not "effectively excluded" from its medical school, the ADA and the Rehabilitation Act require Creighton to "start by considering how [its educational programs] are used by non-disabled [medical school students] and then take reasonable steps to provide [Argenyi] with a like experience." Baughman, 685 F.3d at 1135.

We conclude that the evidence produced in this case created a genuine issue of material fact as to whether Creighton denied Argenyi an equal opportunity to gain the same benefit from medical school as his nondisabled peers by refusing to provide his requested accommodations. At this stage the record supports Argenyi's claim that he was unable to follow lectures and classroom dialogue or successfully communicate with clinical patients. From such evidence a reasonable factfinder could determine that Argenyi was denied an opportunity to benefit from medical school equal to that of his nondisabled classmates. The district court's grant of summary judgment to Creighton should therefore be reversed and the case remanded.[3]

## III.

Creighton has cross appealed, contending that the district court erred by denying its request for costs without providing a rationale for doing so. See Fed. R. Civ. P. 54(d)(1). We need not consider that argument because at this stage Creighton has not qualified as a prevailing party and therefore is not entitled to cost recovery.

---

[3]On remand Creighton may also submit evidence of the cost of Argenyi's requested auxiliary aids and services for a determination of whether providing them would impose an undue burden on the university. See 42 U.S.C. § 12182(b)(2)(A)(iii) (ADA); 29 U.S.C. § 794a(a)(1) (Rehabilitation Act).

See Pottgen v. Mo. State High Sch. Activities Ass'n, 103 F.3d 720, 723–24 (8th Cir. 1997).

## IV.

Accordingly, we reverse the summary judgment granted to Creighton and remand for further proceedings consistent with this opinion.

_____