# United States Court of Appeals

### For the Eighth Circuit

_____

No. 20-3728

_____

Barry Segal

*Plaintiff - Appellant*

v.

Metropolitan Council, doing business as Metro Transit

*Defendant - Appellee*

------------------------------

National Association of the Deaf; National Disability Rights Network; National Federation of the Blind; Disability Rights Advocates; Disability Rights Bar Association

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 17, 2021
Filed: March 28, 2022

_____

Before LOKEN, KELLY, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Barry Segal appeals the district court's adverse grant of summary judgment in favor of Metropolitan Council ("Metro Transit") in this suit involving allegations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, the Rehabilitation Act, 29 U.S.C. § 794, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §363A.12. Because the record contains evidence sufficient to raise a genuine issue of material fact as to whether Metro Transit provided meaningful access to disabled bus riders, we reverse and remand.

## I.   BACKGROUND

Segal identifies himself as DeafBlind. Deaf-blindness is a condition involving both hearing and vision loss, which results in an individual having limited access to both auditory and visual information. Segal suffers from two medical conditions that cause poor vision (20/600). He can see some shapes and objects but cannot see the objects clearly. Segal describes himself as "profoundly deaf." Despite his condition, Segal is able to maintain employment as an accounting systems specialist. He navigates life with the assistance of his service dog, Daisy.

During the warmer months, Segal relies on bus service provided by Metro Transit to travel from his home in Minneapolis to his workplace in St. Paul and other locations in the Twin Cities area. Segal's commute typically requires him to ride two buses in each direction, often transferring at the University of Minnesota West Bank bus stop in Minneapolis. Segal often will use Metro Transit's paratransit provider, Metro Mobility, to travel during colder months or when his route is unfamiliar.

Like other blind and DeafBlind passengers, Segal was trained by Metro Transit's orientation and mobility specialists on how to use the bus system safely and independently. As instructed, Segal waits at designated bus signs, or "T-signs," where Metro Transit drivers have been trained to stop. Segal is able to see outlines of the shape and size of the T-sign, but he cannot read the electronic sign on the front of the bus that identifies the bus route. To identify the route, Segal boards the bus

and communicates to the driver the bus route that he needs through hand signals or using his voice. If he has boarded the correct bus, Segal finds a seat. If not, he disembarks and waits for the next bus to arrive.

Between September 2016 and December 2019, Segal complained 150 times to Metro Transit about bus operators failing to stop at T-Signs and announce the bus route. During this period, Segal rode a Metro Transit fixed route bus approximately 1,791[1] times. Segal filed two types of complaints: (1) single bus incidents, where the bus operator did not stop close enough to the T-Sign to allow Segal to board the bus safely and independently, and (2) second bus incidents, where a second driver pulled around the first bus without stopping at the T-sign, instead of waiting and pulling forward to the T-sign after the first bus had departed. Metro Transit's Director of Bus Operations, Christy Bailly, personally investigated each of Segal's complaints. Bailly reviewed video footage and determined that 74 "verified" complaints were committed by 61 different bus drivers. Bailly considered a complaint to be verified if the driver did not stop close enough to the T-sign for Segal to be visible through the bus entry doors, or if the second bus departed without pulling forward to the T-sign. Importantly, for purposes of the summary judgment motion, Metro Transit conceded that each of Segal's 150 complaints were in fact violations. As a result of those violations, Segal estimates that he was late to work between 5 to 10 times and missed approximately 3 appointments.

Segal filed his first complaint on September 22, 2016. Prior to that time, Metro Transit trained full- and part-time drivers on stopping at the T-signs, and it otherwise required drivers to pull forward to where a disabled individual may be waiting. After Segal's first complaint, Metro Transit undertook steps to remedy the problems, which included circulating route information bulletins that reinforced

---

[1]Metro Transit calculated Segal's total number of rides by tracking each time Segal successfully used his Go-To Card to pay for bus fare when boarding a bus during the relevant period. Segal stated during discovery and testimony that he exclusively used his Go-To Card to pay for Metro Transit bus rides.

existing policies, training and coaching after a violation, directing drivers along Segal's route to stop at T-signs, and updating signage.

From 2015 to 2019, Metro Transit received 153 ADA-related complaints from other individuals involving bus drivers failing to stop for passengers with disabilities. During this same period, Metro Transit reportedly provided approximately 278 million rides and received 8,474 complaints from all passengers (disabled and non-disabled) regarding service at the bus stops.

Segal filed suit against Metro Transit in August 2018, alleging violations under the ADA, the Rehabilitation Act, and the MHRA, seeking both monetary damages and equitable relief. Metro Transit moved for summary judgment. Segal moved for partial summary judgment on the question of liability, arguing the question was foreclosed because Metro Transit violated two Department of Transportation ("DOT") regulations: 49 C.F.R. § 37.167(c), which requires a stop and announce policy, and 49 C.F.R. § 37.173, which requires drivers to be trained to proficiency. The district court granted summary judgment in favor of Metro Transit and denied Segal's motion, finding that Metro Transit provided Segal with "meaningful access" to its services. Segal appeals only the district court's adverse grant of summary judgment.

## II. DISCUSSION

We review a district court's decision granting summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and resolving all reasonable inferences in its favor. Argenyi v. Creighton Univ., 703 F.3d 441, 446 (8th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To establish a genuine issue of material fact, Segal "may not 'merely point to self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a

finding in [his] favor.'" Argenyi, 703 F.3d at 446 (quoting Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005)).

Under the ADA, public entities are prohibited from discriminating against individuals with disabilities by excluding them from participation in, or denying them the benefits of, services, programs or activities provided by the entity. 42 U.S.C. § 12132. The same prohibition applies under the Rehabilitation Act to entities like Metro Transit that receive federal funding. 29 U.S.C. § 794(a). "These statutes provide the same rights, procedures, and remedies against discrimination." I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schs., 863 F.3d 966, 972 (8th Cir. 2017) (quotation omitted). The MHRA similarly prohibits discrimination "against any person in the access to, admission to, full utilization of or benefit from any public service" because of a disability, and it requires covered entities to "ensure physical and program access for disabled persons." Minn. Stat. § 363A.12. "Because '[c]laims arising under the MHRA are analyzed using the same standard applied to ADA claims,' we review the claims simultaneously." Brunckhorst v. City of Oak Park Heights, 914 F.3d 1177, 1182 (8th Cir. 2019) (quoting Philip v. Ford Motor Co., 328 F.3d 1020, 1023 n.3 (8th Cir. 2003)).

In enacting the ADA, Congress recognized that "individuals with disabilities continually encounter various forms of discrimination, including . . . the discriminatory effects of . . . transportation." 42 U.S.C. § 12101(a)(5). We have long held the ADA requires meaningful access to the public entity's services and that mere limited participation does not satisfy this requirement. Loye v. County of Dakota, 625 F.3d 494, 496 (8th Cir. 2010); see Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999). To meet the meaningful access standard, public entities like Metro Transit "are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to . . . gain the same benefit." Id. at 499 (quoting Alexander v. Choate, 469 U.S. 287, 305 (1985)).

As an initial matter, we are unconvinced by Segal's argument that a violation of the DOT regulations amounts to a *per se* violation of the ADA.[2] We considered a similar argument in <u>Loye</u>, which involved a suit brought under the ADA, the Rehabilitation Act, and the MHRA after a mercury contamination led to an environmental cleanup effort affecting disabled county residents. On appeal, the <u>Loye</u> plaintiffs argued that DOJ regulations requiring the county to "ensure that communications with [Plaintiffs] are *as effective as* communications with others," should be read strictly to require county liability. 625 F.3d at 499 (quoting 28 C.F.R. § 35.160). The Court declined to adopt such a "literal reading" of the regulation because the regulations that implement Title II of the ADA must be interpreted in a way that balances "the need to give effect to the statutory objectives" with the desire to keep the result "within manageable bounds." <u>Id.</u> (quoting <u>Alexander</u>, 469 U.S. at 299). We likewise decline to adopt such a strict reading of the regulations at issue here.

In the public accommodation context, at the summary judgment stage, courts examine whether meaningful access was provided to a disabled individual by comparing the service provided to non-disabled individuals. <u>See</u> <u>Childress v. Fox Assoc., LLC</u>, 932 F.3d 1165, 1171 (8th Cir. 2019) (hearing-impaired persons denied meaningful access as compared to those without hearing impediments when theater only provided one captioned performance per show); <u>Loye</u>, 625 F.3d at 499 (no material facts in dispute because the record established meaningful access as compared to all evacuees of environmental disaster); <u>Argenyi</u>, 703 F.3d at 451 (considering whether deaf plaintiff was denied an opportunity to benefit from medical school equal to that of non-disabled classmates). While recognizing that this assessment is naturally fact-intensive and consideration should be given to context, the comparison is straightforward—it involves identification of the non-

---

[2]Whether the DOT regulations create a private right of action under the ADA is not properly before us because Segal did not assert such a claim in his complaint, nor did he raise the argument before the district court. <u>See</u> <u>Eagle Tech. v. Expander Ams., Inc.</u>, 783 F.3d 1131, 1138 (8th Cir. 2015) ("It is well settled that we will not consider an argument raised for the first time on appeal.").

disabled peer group and a determination of whether it can be concluded as a matter of law that disabled individuals were or were not provided an equal opportunity to access the same benefit. See e.g. Durand v. Fairview Health Servs., 902 F.3d 836, 842 (8th Cir. 2018) ("[C]ourts must identify the hearing-abled peer group, as well as the context of the hospital visit, in order to determine whether the hearing-impaired individuals were provided an equal opportunity to access the same benefits.").

Viewing the evidence in the light most favorable to Segal, as we must, the record here contains evidence sufficient to raise a genuine issue of material fact as to whether Metro Transit provided meaningful access. For purposes of the summary judgment motion, Metro Transit concedes that Segal's 150 complaints are in fact violations. These complaints comprise approximately 8.4% of Segal's 1,791 Metro Transit rides. From March 2015 through the end of 2019, Metro Transit's data shows an additional 153 ADA complaints filed by other disabled riders. Of the 278 million rides provided by Metro Transit, non-ADA complaints were filed at the rate of .003% of rides—a tiny fraction when compared to complaints from disabled riders.

Given his number of Metro Transit rides during the relevant time period, it remains in dispute whether Segal (or any similarly situated, disabled rider) was more likely to experience poor service than a non-disabled rider. While Segal was late to work 5 to 10 times and missed only 3 appointments because of issues with Metro Transit's service, the question before us is not Segal's ability to successfully navigate the Metro Transit system despite its shortcomings, but whether Metro Transit was meeting ADA requirements. While we recognize that perfect service is not the standard, on the evidence before us, viewed in a light most favorable to Segal, Segal has met his burden of demonstrating the existence of a genuine issue of material fact at this stage in the litigation. See Argenyi, 703 F.3d at 446.

Overcoming summary judgment is merely the first hurdle for Segal. Scant guidance exists as to how trial should proceed on remand in a case involving meaningful access to public accommodations. The Seventh Amendment

unequivocally extends the right to a trial by jury in civil cases. U.S Const. amend. VII. We conclude that the question of whether Segal was provided meaningful access within the context of state or federal law is a fact-intensive issue, and one that is to be determined by a jury. Relevant to the meaningful access analysis may be a few different factors. Although we declined to conclude that a violation of the DOT regulations amounts to a *per se* violation of the ADA or to address Segal's claim that the DOT regulations give rise to a private cause of action, this does not mean that the regulations are entirely devoid of significance at trial. Here, Segal has pointed to two regulations that he alleges were violated: (1) that Metro Transit "shall provide" a stop and announce policy (49 C.F.R. § 37.167(c)), and (2) that Metro Transit "shall ensure" training to proficiency (49 C.F.R. § 37.173). Courts have often allowed the admission of evidence regarding a violation of a statute or regulation in negligence cases—not to establish negligence *per se*, but as evidence to be weighed by the jury in determining the ultimate question of a party's negligence. In a similar vein, we conclude that evidence of a potential violation of a DOT regulation is a factor to be weighed by the jury tasked with deciding whether an entity or business provided disabled individuals meaningful access to its services.

In summary, Segal has raised a genuine issue of material fact on whether Metro Transit provided him meaningful access sufficient to survive summary judgment. At trial, the DOT regulations cited by Segal are admissible as evidence that the jury may consider and weigh when determining whether Segal has met his burden of demonstrating that he was denied meaningful access to Metro Transit's services. In this context, the term "meaningful access" has its common and ordinary understanding, signifying access to services by disabled individuals that is substantially equal to the services provided to non-disabled persons. After weighing all the evidence, meaningful access is the ultimate finding that jurors must make—a decision resting exclusively within their province.

## III.   CONCLUSION

The district court erred when it determined Metro Transit provided Segal with meaningful access to bus service, despite evidence in the record demonstrating the question remains in dispute. We reverse and remand for proceedings consistent with this opinion.

_____